0750195 United States v. Ganoe Each side will have 20 minutes in this case 0750195 United States v. Ganoe Today there are a number of issues raised in the briefs, as Your Honors are aware, and I'd like to try to address three or four of them. You won't press me, I'm sure. But I'd like to start out by talking about the two evidentiary issues, the admission of the images of child pornography and then second, the limitation of cross-examination. I think that considered together, those two issues were outcome-determinative and required reversal of Mr. Ganoe's convictions. In this case, the defendant attempted on numerous occasions to stipulate to the elements of the offense in order to preclude the admission of the images of child pornography, which have been submitted to this Court and are quite simply horrible. They the defense not only offered to stipulate to the elements of interstate commerce that the images were sexually explicit and thus qualified as child pornography within the statute, but went further and offered on the record to stipulate that anyone who had seen the images even for a minute would have known they were child pornography. I see what the government says. That doesn't really cover all we have to prove. We'll stipulate with you that if they saw the file names, they'd know. And you said no. That's why you said no, because the file names are not all, they're not all that clear. And that was the only issue. Well, that's exactly the point. They have to put them to their proof. But the images don't show. I mean, the point is that the file names, the images, the question in this case was limited. The question was really whether Mr. Ganot was the downloader or whether for some other reason that he knew that the images were on the computer. And the defense was willing to stipulate that if he had seen the images, he would have known, or he knew, in fact, and that would have taken care of knowledge. So the only issue they tried to preserve was whether or not he knew. And the file names were probative of that, clearly, and there was other evidence that the government had that was probative of that. But the images themselves were not probative of that under Old Chief. The images were simply completely, they were extremely graphic, and the government isn't allowed to introduce images just to show that they're gross or horrible or graphic. The government, you know, if he had said, well, I don't think they're really children, you know, or they were, I mean, there are certainly images where one could say, well, I don't think that that is a child. That's a, you know, perhaps an adolescent. Maybe this is a 19-year-old. Maybe it's a 14-year-old. Who knows? The story was I didn't know they were there, right? I didn't know they were there. That's right. Okay. And they say, okay, stipulate that if you saw the titles, you'd know they were there. And you say no. Well, we had to say no because … Well, I understand. But then you can't fault them for putting on their proof. But I don't, but see, that's, but the proof that they offered wasn't probative of his, of whether he knew or not. It's just the graphic images. They had the file names, and they could argue about that. But linking the file names and the images together was the link that the government had to show that the image and the file names matched. But once, but a stipulation would have been conclusive on that point. Not if you wouldn't stipulate to the file name being probative of the nature of the image. But I think that's really more a point for argument, Your Honor. You can't argue anything you don't put in evidence about. Well, they would have had, but they did have the file names. And they also had, well, they had other evidence, which I'm sure they're going to point out, which they did point out in their brief. I mean, I take your point, Your Honor, but I still stand that the graphic natures of the images were not, especially under Moreno-Balderrama, they just weren't relevant once this fairly conclusive stipulation was offered. Yeah, but in that case, it was clear that the defendant had not actually seen the films for his ear. That's not clear. But it wasn't so clear at all. They had these covers that were somewhat graphic and had titles. And then he said he looked at the films. What he said is, I looked at the films. It wasn't clear whether he'd seen the films or not. I mean, you know, when you have a defense like this, I mean, the defense has one side and the government has another side. So it wasn't any more clear than here. I should move on, Your Honor. The second question is the issue of the impeachment of the ex-girlfriend. And the defense attempted to reopen cross-examination once they had this additional impeachment. This was a surprise witness to them, and a rebuttal witness. Wasn't this a rebuttal? Were we on surrebuttal at this point? She thought it was a rebuttal, but the counsel asked to reopen cross-examination, which was denied. Right. And that's really the key here, is that whether she should have been able, whether counsel should have been able to cross-examine the witness about evidence, about incidents of dishonesty. This isn't pure cross-examination, though. This is a surrebuttal testimony after cross-examination has already taken place. It was, except that the cross-examination, if you recall in the record, the witness was called, the defense asked for a recess, which was denied. They said, counsel said, I'm not ready to cross-examine the witness. I don't know about her. The judge said denied. They went on. They did the best they could. Then they asked, then counsel asked the next day, called her back in a surrebuttal, asked for leeway, asked to reopen cross-examination. That was denied. And it's important here because while the witness was clearly impeached on motive and bias, which is obviously inherent in an ended relationship, there was nothing that tended to show that she was otherwise dishonest. And so she came across, I think, as someone who was angry and resentful, but yet nonetheless a reluctant and honest witness. I think you have a good point on this, just speaking for myself. My concern is whether this is harmless error. I'll take your point that it was error. But when you look at all of what they found on his computer and his statements to the agents that he had, he knew basically he had a child pornography problem and he was trying to get help for it. I think the judge should have allowed this cross-examination, but how would it have made a difference given all the way the case played out, particularly his admissions? Well, Your Honor, I think it's not harmless for a couple of – well, first of all, on the question of harmless error, this was a pretty hard-fought case. And the jury clearly had at least some reasonable doubt as to at least the one count. So they believed some of the alibi witnesses. Well, didn't they really just – the convictions were ones that were tied to contemporaneous use of the computer. Isn't that really what they went down on? That's one way to look at it, although there was alibi. That is one way to see it, although if you recall, the day that they acquitted him of was the day that he had alibi testimony and that he was at the firehouse. So it's difficult to know which they believed and what they didn't believe. But I guess my point is that none of that arguably had anything to do with the ex-girlfriend. They could have totally discounted that. I mean, reading this information, it appears that, you know, your – whether it was you or somebody else that destroyed her credibility. I mean, she really had virtually no credibility left, and it seems like the jury thoroughly discounted that. Actually, Your Honor, with respect, I must disagree because her testimony was critical because it not only totally damaged the defendant's character, which there was character evidence presented. So this was – I mean, accusing someone of suborning perjury is the ultimate attack on character. But it also damaged Yvette Ganot's character because it said that she was – because Serrano said that she was in on it. And so essentially – so that damaged the more credible alibi witnesses. That all had to do with Ray Rodriguez, and the jury didn't buy Ray Rodriguez, did it? Well, we don't know what they bought because of Serrano. We don't know. We don't know. I mean, I don't think it's clear that – I mean, I just – I think that it's – you know, this is what – the bottom line was there was a plausible defense, and I think they didn't believe – you know, once Serrano got up there and said, well, you know, they're all lying, the whole family's in on it, basically, is what she said, then certainly the severity of that damage and allowing the jury to see her as this, you know, reluctant, gee, I don't really want to testify against him. But again, you get back to the fact that the jury acquitted on the one count, just like all the rest of them except for the fact that the government had no proof that he was there and using the computer at that time. I don't think, again, with respect, Your Honor, that you can boil the verdict down to that. It's true that there was more probative evidence regarding that, but I don't think you can boil the verdict down to that. If there's no further questions on this point, I'll move on. The other two issues I would like to address today are the issue of the search, the limewire search, and the sentencing issue. And I'd like to start with this – unless the Court has a preference, I will start with the guideline issue in this case. The judge applied the base offense level from 2G 2.2. I always confuse which one is which. The judge applied the offense level in this case that is designed for trafficking. And the probation officer, of course, had recommended use of the lower offense level, 2G 2.4. These guidelines have since been superseded, but at the time there was a separate guideline for possession as opposed to trafficking. The Court applied the higher guideline on the theory that because he was convicted of receipt, it should apply that guideline. And when you look at the structure of the guidelines, particularly the amendment that enacted 2G 2.4, it's clear that the commission intended for a lower – in fact, they even use – if you read the amendment itself, it refers to receipt or possession that does not involve trafficking. But in this case, though, counsel, literally by use of the software that the government discovered this in the first place shows that he was – it was available for Internet trafficking. Otherwise, they couldn't have discovered it. And he also received images over the Internet. Isn't that exactly what 2.2 is designed to cover? Not when you read the commentary, which is binding, unless it's inconsistent with the guideline itself. And the sixth – I mean, essentially what this is, is we have a defendant who was not charged with – was originally charged with distribution. That was dismissed. It was superseded. There's no evidence that the images went out other than the time that the agent got them. And the court even said, well, you know – I mean, the court – I'm applying the 2003 guidelines as I must because of the ex post facto clause. And it's – the gravamen of his behavior, of his conduct, was possession. And the – you know, to apply the higher guideline to him, it really – I mean, I think the Sixth Circuit said it well in the Farrelly decision. It elevates formalism over fact. You know, we have someone who really didn't do anything except receive these images, which is inherent in every possession. There is a receipt that's inherent in every possession, unless you're making it, which, of course, is covered by a different guideline. It's much worse and covered by a different statute entirely. So that – I mean, I think that the Eleventh Circuit and Sixth Circuit have the interpretation, have the better of it. There don't seem to be any – if there's no more questions on this, I will, again, move on. And I'll reserve some time for rebuttal. The final – you know, possibly one of the more interesting issues in this case is whether the agent search, the Arizona agent search, violated a reasonable – any – a subjective or reasonable expectation of privacy. I'm at a loss just to understand how a guy can have peer-to-peer software on his computer that's open up for the world. Anybody who wants to can go on there and look at it. And, you know, when the cops go on and they're one of the people in the world who look at it, he can say, well, gee, it didn't mean you. I just meant my fellow pedophiles. Well, he's not – well, I take your point, Your Honor. But the difficulty here is that there is – this is a – at the time, in 2003, this was a relatively new form of software. Well, he doesn't know how to use his software. You know, okay, so he's a dope when it comes to software. Well, I think it's – It's like leaving your drapes open. You know, you are not smart enough to close your drapes. You can't complain when people look in the window or see you in the window. He has the software on there. He doesn't know how to use it, but it opens up his computer to the world. I don't see where he has any basis to complain. He did it to himself. I mean, he's the author of his own misfortune, you know. Your Honor, to say that there is no reasonable expectation of privacy, as the court did, the lower court did, just because he's downloaded software, is – it's at a minimum – You've left out the other half. He's downloaded software that opens up his computer. Yes. Yes. The problem is, is that there are millions of people, or hundreds of thousands, certainly, who've downloaded the software and really have no idea that it's opened up their computer. Is that their problem? I mean, isn't that – you know, you don't – if you don't know how to use the software, don't do it. He knew that people were going to access, or could access, his computer, just like he could access – Well, it's not clear that he did know that, Your Honor. The judge could have found that. He didn't. That's the nature of peer-to-peer software. That's correct, Your Honor, although the – but there are – I mean, I think it's important to look at this – I mean, look at it another way. It's somewhat analogous to linking your computer to a network. Merely linking your computer to a network doesn't relinquish your right to – doesn't relinquish your interest in privacy. But in this particular instance, according to the record, the installation prompt said, and quotes, Choose a folder where you would like your files to be downloaded. This folder will also be shared with other users by default. Now, your client had enough knowledge to set up a Z storage site under iTunes. Yeah. Obviously, somebody has some sophistication, assuming he can read English. He knows right off the bat that other people in the network can see what's there. Doesn't that go to the point that Judge Silverman made a minute ago? I'm not sure that it's – Your Honor, I'm not sure that it's the same thing. I mean, creating a folder, a subfolder, is a pretty simple operation. Okay, well, assume that it is. Let's go back to the default notice. He had to see that to get to the next step. So he was put on notice that this was open to all the world. I'm not sure – well, two points. First of all, opening something to peers doesn't necessarily mean you know you're opening it to law enforcement. I mean, if you have a conversation with somebody – Well, is there a way to say everybody's welcome here except law enforcement? No, there isn't. I mean, I'm not – but it is a difference. For example, if somebody has a conversation – if I have a conversation with Judge Rawlinson, for example, and I make some incriminating statements, I'm running the risk that she might tell somebody. But that doesn't mean that a third party gets to tap that conversation. She might be taping it, and I might be in trouble there. Sorry, Your Honor. Isn't it a question of whether there's a reasonable expectation of privacy on your client's part in order to secure Fourth Amendment protection? Yes, Your Honor. And really here, what at least I'm struggling with, and I think perhaps my colleagues as well, is how can you have a reasonable expectation of privacy with such a warning? I guess – I think that the key is that the warning isn't specific. It doesn't warn about monitoring as, for example, university networks often or employers often have a policy. They say, you know, your work on the computer isn't private. There's no warnings. There's no real explanation of what does sharing mean. So there's a presumption of privacy on these networks. Is that what you're saying? I'm not sure that there is anymore, but I think there probably should have been in 2003 before all the knowledge about what – I mean, I think now it's probably much more commonly recognized that if you do this, you know, you're really running a risk. I mean, frankly, I've never downloaded that software on my computer. But I think at the time, no, it didn't. It didn't tell people enough. If there aren't any more questions, I'd like to reserve my time for rebuttal. Thank you. Thank you. Good morning. May it please the Court. Mark Krauss, United States. Unless the Court would prefer me to go in a different order, I was going to try to take up the arguments that Defense Counsel raised and her argument in the same order. Starting first with the argument related to the introduction of the images, the district court did not abuse its discretion in allowing the government to introduce limited, edited, and a few images in order to prove a variety of the elements that the government was required to prove at trial. The district court was faced with a situation where the parties had, over a series of seven months, attempted to come to a stipulation that might resolve the issue, and the parties were not able to reach it. Had Defense Counsel been correct and the parties had never been able to reach a resolution, the effect would have been to be unable to introduce any evidence of child pornography at all. Isn't that correct? If I understand the Court's hypothetical, is the Court asking if the parties cannot reach a stipulation, could the Court then prevent the government from introducing images? Right, if she's correct. No. Your Honor, I don't think even Old Chief stands for that proposition. Certainly, this Court's decision in Moreno-Belderama does not suggest that either. Old Chief takes great pains to suggest that a defendant can't force the government to forego certain evidence by offering up a stipulation. And by my argument, I've only suggested that there was no stipulation in place. This is a situation where the evidence of the images was extremely probative, not to show that the images were in fact child pornography, but to show that the defendant knowingly possessed the child pornography. And finally, that in selecting these images for downloads, the defendant intentionally downloaded child pornography. If you take a look at what Baby J. Teddy looks like, you know what you're getting when you're seeing Baby J. Butt-Hop. It's the association between the file titles to the images, as the Court has recognized previously. And indeed, a number of circuits have held that the court, that a defendant cannot sanitize the trial through an offer of stipulation. Most recently, in the case I cited in the 28-J letter, Morale al Donato, but it is certainly not the only case. The case from the Eighth Circuit, the Beck case, is another case in which the circuit held that the government can't be forced to forego highly probative evidence on a variety of elements simply through an offer to stipulate. I take your point that you shouldn't have to forego highly probative evidence, which brings me to her argument with respect to the impeachment of Serrano. Is that right? That's how I understand your question. Yes, Your Honor. They had some pretty powerful evidence, too, that the judge didn't let in, evidence that would have shown that she has prior instances of dishonesty, which ordinarily they'd be entitled to demonstrate. Well, I would first observe that the defendant was able to cross-examine her on her own. On bias. No, not just bias, Your Honor. Also on prior inconsistent statements, which goes to her dishonesty. In fact, defense counsel in her closing was able to make great hay with the fact that this is a witness that was not worthy of the jury's trust or consideration or reliance. Yes, but they weren't able to prove prior instances of dishonesty. If the court is asking whether the defendant was able to cross-examine the witness on prior instances of theft, at page 43 of the January 18 transcript, defense counsel implied that the witness had stolen furniture from the defendant. So this is not a situation. I'm not talking about those incidents. I'm talking about the incident with the misusing of the credit card to purchase cosmetic surgery and also for some shoes. I don't. The judge said that didn't have anything to do with the case. I think it's important to look at the judge's statements in context. Here is a situation where, as the court has recognized, the defendant was beginning a sir or a bottle case. So the court asked counsel directly, what is your proffer with respect to your examination of this witness? The defense counsel represented that there would be two areas of inquiry. There was an inquiry regarding the blog, which had been examined about previously, but there was substantial additional cross-examination on January 18th. The second issue was whether she was in a position to observe the things she claimed to observe about. No reference to these other allegations of fraud. When it came down to it and defense counsel again tried to cross-examine on those new issues, issues that had not been previewed for the court, the court was given a fairly limited proffer, two instances with no description of how it was connected to the defendant. And under those circumstances, in the end. You mean how it was connected to the defendant. I'm sorry. To the witness. I apologize. I misspoke. How the basis for the cross-examination of this witness. And. I don't understand that either. They offered to prove that they had two instances where she basically committed a dishonest act. Yes. Why isn't that pretty clear of what it's probative of? I think under the low case, for example, this Court has held that a district court can properly limit cross-examination in circumstances where there's an insufficient foundation regarding the issues of cross-examination. In the low case, the Court may recall it's a situation where the government called a witness who was involved in a fraudulent transaction. Defense counsel sought to cross-examine that witness about that fraudulent transaction. The district court did not allow that cross-examination, in part suggesting that there was insufficient foundation and it was too speculative about whether that witness was involved in the fraud. You're saying it was too speculative here that she had had this cosmetic surgery and had charged it to the. There was no, there was, in either situation where the district court gave defense counsel an opportunity to give a proffer about what the cross-examination would be, there was nothing in the first offer and in the second, just that they sought to cross-examine about these two issues and there was really no foundation for the cross-examination. Under those circumstances where there was no foundation, there was already substantial cross-examination of this witness. What should they have said to have made their record better? They could have, for example, submitted an offer of proof describing the employer. They could have provided documents. The Court may recall that before this witness took the stand, defense counsel provided the government with an involuntary bankruptcy position or a voluntary bankruptcy position. Frankly, I don't recall. But they could have provided documentary evidence to provide a basis for the context of the examination and its parameters. They chose not to do that. Indeed, they chose not to provide any proffer about it when directly asked by the district court before the examination began. So they could have basically told the district court, this is what we want to do. This is how we want to prove it. These are the circumstances regarding these prior incidents. They passed up that opportunity. Under those circumstances, under Lowe and under Green, Green being a Seventh Circuit case, but Lowe being the, I think, operative case under the Ninth Circuit, it was not improper for the district court to say, this is too speculative. We're in, sir, rebuttal. This has gone on a significant amount of time. Additional attempts to impeach this witness, notwithstanding the fact that they've already gotten facts that there were five separate instances which they claimed were prior inconsistent statements. They claim, for example, that this witness declined to say this information when she was interviewed by defense counsel prior to the case being brought. They claim, for example, it was a prior inconsistent statement when she wrote a blog describing her experiences with the defendant and did not disclose the plot to provide perjured testimony. They claimed it was a prior inconsistent statement when she did not go to the police because she didn't want to get involved. They said it was a prior inconsistent statement when she wanted to go on the Oprah Winfrey show and describe how troubled she was by the whole thing. And they suggested that it was a prior inconsistent statement when she invited people to a party to celebrate the end of her relationship with the defendant. Those five instances of prior inconsistent statements gave the defense counsel substantial ammunition to, during the closing argument, claim that this witness was not worthy of the jury's reliance or consideration. And as the Court recognized before, they were able to make significant arguments about why this witness should not be trusted. But as I mentioned earlier, this is not an area of examination in which the defense was, in terms of her honesty, in terms of prior incidents of alleged dishonesty that the defense was prevented from getting into, as they did examine her on alleged accidents. What's the government's argument that if Judge Silverman's question is correct, that there was a violation here? Why would this be harmless error in this instance? Well, this case was basically either could be looked at as a confession case or it could be looked at as a CSI case. As a confession case, the district court and the jury heard substantial evidence regarding how, the day after the search, the defendant called one of the special agents and acknowledged the fact that he was in counseling for his habit of viewing trial pornography. What's more, the jury heard a recording, as well as reviewed a transcript, in which the defendant described how he was in a dark place. There was certainly an attempt to suggest that he was in a dark place because of a misdemeanor firearms conviction, but that simply was not particularly credible. This was a case in which, in addition to the confessions, the district court allowed the government to put on forensic evidence, and the jury heard approximately a day and a half of computer forensic evidence showing two things. One, that contemporaneously with the downloads of the child pornography and the viewing of the child pornography, the computer user also was conducting Internet activities that identified the defendant as a computer user, to include the payment of the defendant's bills, the purchase of eBay items such as coffee the correspondence between the defendant and his friends at the fire department, as well as other online activities that showed the defendant and nobody else who was downloading the child pornography and sending it. As the court observed earlier, the one count on which the jury found the defendant not guilty was one where the forensic evidence was not as tight. Certainly, it was the government's position that it was sufficient in order for the jury to find the defendant guilty of that charge, count three. However, there was, I believe it was up to a six-hour gap between the downloads and the last Internet activity showing that it was the defendant and nobody else. So it was reasonable under those circumstances for the jury to conclude that forensic evidence wasn't as tight. But that's just the first part. There's also the issue of the file structure indicating that it was the defendant and nobody else. This is a computer in which virtually every item on the desktop dealt with the defendant. There was guitar fingering music sheets. There were DMV records. And in addition, if you look at the file structure of the way, the manner in which the files were organized, they were organized in a subdirectory of the Z folder. There was really no other evidence on the computer that indicated that it was anybody else but the defendant who downloaded these images. So it's certainly the government's position that any error, although the government maintains there was no error in the district court's, there was no abuse of discretion, rather, I should say, in the district court's, the manner in which the district court conducted the cross-examination of Coralie Serrano. In light of the fact this was Sir Rebuttal, there had already been substantial cross-examination and whatnot. But assuming that was an abuse of discretion, and certainly the government is not suggesting it, any error was harmless in light of the substantial evidence regarding the defendant's confessions. And the government does contend this is an abuse of discretion standard. It's not a confrontation clause de novo issue. That's correct, Your Honor. The government would also point out that in addition to the errors of cross-examination, which I've already identified, to include the prior inconsistent statements and the allegations of theft, the defense was allowed to introduce evidence about Ms. Serrano, including that she assaulted the defendant bloody in his face, that she engaged in accessing his computer accounts, presumably without authorization, which would be a violation of 18 U.S.C. Section 1030-A2, that she had a quest for fame, and that she was very angry. So this is a side from the issue of her credibility or lack thereof. The defense was allowed to cross-examine her and introduce evidence suggesting that this witness was not worthy of consideration. So on a collateral issue in Sir Rebuttal, the district court did not abuse its discretion in suggesting that there was enough impeachment evidence for the jury to evaluate the witness's credibility, as this Court's decisions have previously indicated. Not the least of which is the Lowe case. Unless the Court has any further questions, I'll move on to the remaining issues. Let me ask you a question that, in the scheme of things, is not the biggest issue in the world, but it's got me scratching my head. I don't understand the fine here. The fine, was it a $15,000 fine? Yes. The probation department recommended no fine on the grounds that he can't pay it, and nevertheless, the judge imposed a $15,000 fine. I'm not clear what the basis for that was. The probation officer made the recommendation that no fine should be imposed, but the record created by the probation officer, as well as the trial record, indicated that the defendant had an inability to pay, and therefore the defendant failed in his burden of showing that he couldn't pay. In addition to that, What did the record show about his ability to pay? Well, the record showed that there was probably $170,000 of equity in the defendant's home, which the government acknowledges that the defendant shared with his wife and his sister. But it's a substantial amount of equity in that real estate, and it's true, although the defendant had contingent liabilities, that's a large chunk of equity, and certainly the defendant didn't do anything to suggest that. I understood that the house was fully encumbered. That's not how I read the PSR. I read that the liabilities were contingent with respect to the encumbrances on the house, and that that What does that mean? There was a reference in the PSR about liabilities being contingent. I was not aware of the defendant being involved in any lawsuit that might suggest a later liability being in place, and with respect to the payment that he received from the Orange County Fire Department, my understanding is even though he didn't work while he was suspended, he keeps that money regardless. So I'm not aware of what the contingency was, but my reading of the PSR was that those liabilities were contingent. What's more, the district court did hear substantial testimony during trial, for example, that the defendant had a number of vehicles to include not only a new ATV, but a trailer in which to put it. He owned free and clear all of these vehicles? There wasn't any testimony about it, but it was described as his vehicles, and he was excited to use them. Well, you know, you can look at my vehicle, and I can assure you, you know, I don't quite get what net worth he had, or where we can find what his net worth was. Certainly the PSR describes the assets he has as well as contingent liabilities. And my recollection is that the PSR described those liabilities as contingent. In any event, it is the defendant's burden to show that he lacks the ability to pay. The defendant apparently relied simply on the statements in the PSR, and the district court rejected that and found that he did not meet his burden. And to that end, it's the government's position that because it's the defendant's burden and the district court did not clearly err in finding that he had an ability to pay. And, again, the observation I would make is that it was a fine of only $15,000. Because he was convicted on all or three of the four counts, the fine could have been up to $750,000. The district court plainly didn't impose that, only imposed $15,000 for a person who is a relatively young man, is going to get out of prison, is presumably going to get a job. The fact that he is going to have now this conviction for child pornography under the Reardon case is sort of immaterial. He's going to have to get a job. And even with a child ---- He can't go back to firefighting, I take it. Is that right? It's my understanding that he was terminated, and I think it's unlikely that he'd be able to find any jurisdiction. I'm not aware of any jurisdiction that would allow it. But, then again, I don't know any. I don't know. My sense of fire ---- Balejo. You know? Okay. I'll rely on the court. They're bankrupt. Okay. But with ---- Okay. So with respect to the record on the fine, the district court relied on the facts contained in the PSR. I believe that they found that those liabilities were contingent, and therefore found that the defendant failed in his burden, and the government would submit that the district court did not clearly err in that finding. I believe the remaining argument relates to the peer-to-peer network argument, and I think the court's observations are correct. This is a situation where the district court found that the defendant, based on the notices that were plainly advertised and the splash screens, knew exactly what he was getting into. This is an individual who downloaded peer-to-peer file-sharing software. Anything related with the term would indicate that what you're doing is you're sharing files with other people.  I think what's more, the splash screens themselves put the defendant on notice that by installing the software, some of the files would be shared with others, and that's indeed what happened. What if there weren't a splash screen? Would it be the same result or a different result? Well, certainly the Tenth Circuit's decision in Perrine suggests that it wouldn't matter, that if you're downloading software, it's file-sharing software, presumably you're down ---- we're assuming that the person is downloading it intentionally instead of it being packaged with some other sort of weird software, in which case they don't know that they're activating the software. Under those circumstances where the person is knowingly downloading peer-to-peer file-sharing software, it's hard to imagine a defendant having a subjective expectation of privacy. But leaving that aside, I think the Court's observations are correct. It's hard to imagine that expectation of privacy being objectively reasonable under the circumstances, given that we're talking about someone who is effectively committing a crime in front of a large bay window in their own living room. True, they're in their own living room, but they're advertising for the world to see what they're doing. And factually, that's how it was borne out. We had Agent Roquefort accessing files on the defendants that the defendant had made available for sharing, just like any other user would. And the defendant bore that risk when he chose to install the file-sharing software, particularly a type that put the defendant on notice that his files would be shared. So I think the Court's observations are correct, unless the Court has any further questions. I don't think so. Thank you, Mr. Krause. Ms. Landau? I'd like to address this Court's question about the fine first. The record, the PSR, showed that Mr. Arvino had $184,000 in liabilities. And he did have some assets. He had three vehicles that were valued at about $44,000, but obviously liabilities substantially exceeding that. The government referred to the equity in the house. The house is actually owned by his mother. His mother and his sister and him all lived there. And while his name is on the property, it was pretty clearly not available. The house also was, at the time, worth $620,000, but it was encumbered with $450,000. So whatever equity, A, it's the family home that he grew up in. B, limited, very, very limited equity. And this was the record before the district judge. He objected to the fine. Yeah, he did. And he – well, they urged an imposition of no fine, and then the Court imposed it. So it was in the record that they agreed with the probation officer. Additionally, this is a defendant who was a lifelong firefighter. He will not be able to return to firefighting. He will have to register as a sex offender. It's very unlikely that he's going to be able – it's unclear what kind of job he's going to be able to get at all. I'm sure he will get a job. But a $15,000 fine, while it may be low for somebody who's earning $100,000 or $150,000 a year or even maybe $85,000 a year, it's a huge sum to somebody who's working for minimum wage. It's huge. And respectfully, the district court clearly erred in imposing that fine. What about the payout from the fire department? That – my understanding, that was – well, you mean – no, the government referred to something I'm not aware of, the salary that he got while he was on administrative leave. That was not part of his assets. If you're talking about his retirement money, that he can't even access because I assume it will have to roll over. I thought the government referred to money that he got from the fire department. Well, I thought that the government referred to him getting paid while he was on administrative leave during the trial, and that money was – it was used – to pay his attorneys. In fact, even though, you know, currently he is an indigent, in fact, this court authorized the payment of transcripts at government expense. Usually when one leaves a government job, there's a payoff for accrued sick leave, accrued vacation, and that's – I was assuming that was the money he was talking about. I am not aware of that, Your Honor, and it's not referenced in – I mean, I relied on the PSR and the net worth statements that were submitted, and there was no contention that those statements were inaccurate. Just briefly, I'd like to return to the issue of the government's representation of the record on Ms. Serrano. And the government is – seems to be contending two things, that the standard of review should be abuse of discretion because there was no confrontation clause violation. We disagree with that. The standard of review is de novo because the court precluded an area – an entire area of inquiry, namely dishonesty. Now, the government says, well, these prior inconsistent statements show that she was dishonest. But that's really not – that's – first of all, there wasn't a lot that they were really inconsistent. There was testimony that she didn't tell other people about these things. But there was nothing that indicated she was dishonest. And as far as taking his furniture, I mean, this is the kind of thing that, you know, one would write off to motive and bias, the end of a relationship, an acrimonious relationship. It's not the same as evidence that shows – Counsel, let's assume that all of that's true, and let's assume there's a violation. The government's indicated and reminded us of the overwhelming evidence involved in this case. You have the confession. You have the contemporaneous use of the computer. If she hadn't existed, what difference would it have made to this jury? Respectfully, Your Honor, again, I must disagree. The contemporaneous evidence of the computer is that. But the confession issue was actually – the agent was impeached on that because she said that she was – that he referred to – he's talking about the Condon – Ms. Condon's testimony. He said – she said that Mr. Gannell said that – you know, basically admitted that he had looked at child pornography. But her notes only – she was impeached because her notes didn't use her usual abbreviation for child pornography, and the defense contention was that, in fact, they were talking about adult pornography, and he was embarrassed about that. There were also a lot of other really gross things on the computer that were just kind of strange and unattractive, and, you know, who knows? I mean, computers are full of all kinds of private things. The – the other point, again, and I mentioned this earlier, but I won't belabor it, but again, Serrano destroyed the credibility of Yvette Gannell by accusing her of committing perjury. And who knows if the jury – if, you know, without that, the jury might well have believed that there was this third party. That's a stretch. Well, Your Honor, that was the defense. It was plausible, and Serrano really was – she was critical to the government. She not only accused Gannell – not only destroyed his credibility by accusing him of subordinating perjury, she directly attacked the credibility of his sister. Excuse me, go ahead. I just wanted to ask you real quick – do you want to finish your – Well, I was just going to say, the whole Ray Rodriguez thing, there was never any – this guy comes in, nobody knows who he is, he's living there, he's right there at that time. I mean, that's an incredible story. And the fact that she may have destroyed the jury's belief in the defense's reliance upon that, you have to believe that it was a credible story in the first place, don't you? To some extent, but, you know, Your Honor, there was other evidence that actually supported it. For example, the government agent admitted that lime wire was being used when Mr. Gannell was at work. So there was – and there was evidence – It can be set up that way. That's right. And there was evidence that definitely there was somebody else involved in using the computer, and in downloading the child pornography. So, I mean, the other way to look at the verdict, aside from the forensic, another way to look at it is to say the jury believed that Mr. Gannell was involved, but that there was already also somebody else involved. And if you look at it like that, then not allowing the impeachment of Serrano is critical. I just wanted to ask you, Mr. Krause said that when it comes to the proffer that you made about what you would have proven, it was too vague. You didn't have the goods to deliver it. You know, Your Honor, I mean, this case was conducted in the heat of trial. She was – Serrano was called. She was surprised to the defense. You know, the court said, well, I don't think you should have been surprised. You know, you should have known. Well, they didn't know. And the – you know, defense counsel – I mean, and as – and often – But I mean, what he's saying is you just can't insinuate it. You've got to have some basis for it. Well, counsel said she had – I mean, all you need is for counsel to have a good faith belief to ask the question. And there's no indication that counsel in this case was anything other than highly professional. She had a good faith belief to ask the question. She wasn't making it up. And she should have been allowed to ask the question. Now, if Serrano had denied it, then they wouldn't have been able to impeach under rules – you know, there's the rules about extrinsic evidence to impeach on a collateral matter. But she was entitled to ask the question. Thank you very much. Thank you. The case is argued. This is the morning I submitted it.
judges: Silverman, Rawlinson, Smith